CITY OF CLEVELAND v. BIGELOW et al.

(Circuit Court of Appeals, Sixth Circuit. November 13, 1899.)

No. 743.

1. EJECTMENT—TITLE TO SUPPORT ACTION—RULE OF FEDERAL COURTS.

It is the settled law of the federal courts that a plaintiff in ejectment must show a good legal title in himself, and must recover, if at all, upon the strength of his own title, and not upon the weakness of that of his adversary.

**2.** BOUNDARY OF CITY LOT — DISCREPANCY BETWEEN PLAT AND MINUTES OF
SURVEY.

A plat of a city, as originally laid out, which was recorded, and by ref-
erence to which conveyances were made, showed that a particular lot at the
intersection of two streets was not rectangular, but that the exterior corner
had been taken off, and added to the width of one of the streets. The
minutes of the original survey contained a statement of the width of the
street, without showing that it was not of uniform width throughout, as in
fact it was, as shown on the plat, except at this particular corner, where
it terminated. *Held*, that the plat and minutes were not inconsistent,
but that, even if contradictory, the plat would control as to the boundary
of the lot, where it was the settled policy of the state, as shown by its
statutes, to require the recording of plats of cities and towns.

In Error to the Circuit Court of the United States for the Northern
District of Ohio.

M. G. Norton and Ford, Boyd & Crowl, for plaintiff in error.

Noble, Pinney & Willard, for defendants in error.

Before TAFT, LURTON, and DAY, Circuit Judges.

DAY, Circuit Judge. This suit, having been removed from the
state court, was tried in the circuit court for the Northern district
of Ohio, to recover possession of certain real estate in the city of
Cleveland. The petition is an ordinary one in ejectment for the re-
covery of real estate, and describes the premises as being "all that
part of original lot 97 in the plat of the village of Cleveland (now the
city of Cleveland) lying southwesterly of a line commencing upon the
southerly line of Huron street, at a post standing sixteen rods and
thirteen feet westerly from the intersection of the westerly line of
Miami street with the southerly line of said Huron street, and drawn
thence northwesterly direct to a point on the easterly line of Ontario
street, distant twenty-five rods four feet southerly from the north-
west corner of said original lot 97." The city of Cleveland interposed
a general denial of the allegations of the petition, and set up that the
land described was, on April 9, 1831, deeded by one Horace Perry to
plaintiff in error for the use of a road or highway; that said deed had
been duly recorded, and said city had accepted the grant, and con-
tinuously owned and kept said premises. To the answer of the city
a reply was filed admitting that the premises in question had been
deeded at the time claimed in the petition by said Horace Perry to
the trustees of the city of Cleveland to be used as a road or highway,
but denying that the city had held, kept, or used said premises for
said purpose. John W. Wardwell, as receiver of the Cleveland,
Canton & Southern Railroad Company, was originally a party to the
suit, but the issues between the plaintiffs and said Wardwell were
determined by a consent judgment, and the case went to trial to a
jury as to the issues joined between the plaintiffs and the city of
Cleveland. At the trial the plaintiffs abandoned all claim to a por-
tion of the property described in the petition, and claimed a legal
title and right of possession in a part of the premises, for which they
recovered a verdict and judgment. From the testimony and the ad-
missions of the pleadings, it appears that both parties claimed title
under Horace Perry, who, up to the time of the conveyance to the city

on April 9, 1831, may be regarded as the owner of the property in controversy. It was evidently the purpose of Perry to deed so much of lot 97 to the city of Cleveland as is described in the petition and answer. The testimony in the case, without reference to certain maps of the city, the competency of which were controverted in the court below, shows that lot 97 was one of the original lots on the plat of the village, now city, of Cleveland, and can be best understood by reference to Exhibit A, with its accompanying minutes, which was admitted in testimony from the Cuyahoga county records, and Exhibit B, also admitted in evidence from the same source.

Exhibit A.
"Cleveland Survey, by Amos Spafford, in 1801. .

"Minutes of the survey of the outlines, roads, lands, and square of the city of Cleveland, as surveyed for the Connecticut Land Company in the year 1796, by Augustus Porter, said minutes retaken by Amos Spafford, surveyor, November 6, 1801: Said city is bounded as follows, viz.: Beginning on the lake shore, on the east bank of the Cuyahoga river; then eastwardly, on the shore of the lake, one hundred and two chains; then south, 34 degrees east, eighty-

Exhibit A.

eight chains and fifty links; then S., 56 degrees W., thirty-eight chains fifty links; then N., 34 degrees W., ten chains and 50 links; then S., 56 degrees W., to the bank of the Cuyahoga river; thence down said river as it winds and turns to the place of beginning,—containing in the whole about five hundred and twenty acres, through which the following roads are laid, in the following manner (viz.): Bath street, so called, begins in the east bank of the Cuyahoga river, seven chains 50 links above where it empties into Lake Erie; thence N., 66 degrees E., thirty chains, to a large white-oak post standing in the west line of Water street; all the lands between said lines and the lake is included

## Exhibit B.

in said Bath street, and is from 3 to 5 chains wide. Water street is bounded by said post on the west side, and is one chain and 50 links wide, and runs from said post N., 34 degrees W., to the lake shore; then S., 34 degrees E., 29 chains to a white-oak post standing on the northwest corner of Superior street. Superior street is two chains in width, and begins at said last-mentioned post, and runs N., 50 degrees E., 50 chains and 50 links, to a white-oak post standing on the west line of Erie street. Erie street begins at the last-mentioned post, and is one chain and 50 links wide, and runs N., 34 degrees W., 32 chains, to the lake shore; then from said post S., 34 degrees E., 55 chains, to a white-oak post marked 'E. S. No. 133.' Ontario street begins at a post standing on the bank of the lake in the west line of said street, 24 chains east of the east line of Water street; then running S., 34 degrees E., 51 chains, to a post standing in the north line of Huron street; said street is one chain and 50 links wide. Huron street begins at a post in the north line of said street, on the east bounds of the city, 33 chains north by west from the southeast corner of said city; then running S., 54 degrees W., 53 chains, to the east bank of the Cuyahoga; said street being 150 links wide. Ohio street is 150 links wide, and begins at a white-oak post standing in the north line of said street, and in the west line of Erie street, 11 chains 50 links north of the south line of the city; then running south, 54 degrees W., 16 chains, to a white-oak post marked 'O. S. No. 117'; then turning at right angles, and running in the east line of said street twenty chains, to a white-oak post standing in the south line of Huron street. Lake street is 150 links wide, and begins at a white-oak post standing in the north line of said street, and in the west line of Erie street, 21 chains and 50 links north, 34 degrees west, from the northeast corner of Superior street; thence running S., 56 degrees W., 49 chains and 50 links, to a white-oak post standing in the east line of Water street. Superior lane begins at a post standing in the southwest corner of Water street and northwest corner of Superior street; thence running S., 77 degrees W., nine chains, to the Cuyahoga river; thence up the Cuyahoga river two chains fifty links; thence N., 72 degrees E., to a white-oak post standing in the center of Superior street on the west line of Water street. Union lane begins at the same post of Superior lane, is 100 links wide, and runs a west direction to the Cuyahoga. Mandrake lane is 100 links wide, and begins at a white-oak post standing in the north line of said road and west line of Water street, 13 chains south from the post standing at the southeast corner of Bath street, and running S., 56 degrees W., five chains, then nearly south, until it strikes Union lane. Vineyard lane begins at a white-oak post standing in the west line of said lane, being the southwest corner of Superior street; then running S., 12 degrees W., to the Cuyahoga river; said lane is 75 links wide. The square is laid out on the intersection of Superior street and Ontario street, and contains ten acres. The center of the junction of the two roads is the exact center of the square. The above-described city or plot is laid into 220 lots, of about two acres each, which contain what land is described in the outline, except about 50 acres lying in the bend of the Cuyahoga, which is bottom land, and not lotted out. For the particular numbers and boundaries of each lot reference is to be had to the field notes and maps in the register's office in the county of Trumbull or in the city of Cleveland. Recorded February 15, 1802, for me, John S. Edwards, recorder for Trumbull. I certify that the foregoing is a correct copy taken from Deed Book A, page 100, Trumbull county records, for A. Southerland, recorder.

"H. H. Leavitt, Clerk.

"Recorded Nov. 22, 1814. Horace Perry, Recorder.
"(Deed Book A, page 484, Cuyahoga County Records.)"

The testimony contains varying opinions of engineers as to the proper boundary of lot 97. There was also testimony tending to show that the Connecticut Land Company, for which company it appears that the original surveys and plats were made, by its trustees, had made a deed to Samuel P. Lord of lot 97 and certain other lots, in which they are described as follows:

"The several tracts of land hereafter described, situated in Cleveland city, in Trumbull county, and territory northwest of the Ohio, viz. lots number 85, 86, 87, 97, 98, 99, bounded as follows: Beginning at a post where the south

line of Superior street intersects the east line of the square of said city: running easterly, by said street, eight rods; thence southerly, to the southeast corner of lot No. 99, eighty rods, being the north line of Huron street; thence westerly to Ontario street; thence, by the east line of said street, to the said square, and following the lines of said square to the place of beginning."

It was the contention of the plaintiffs below that lot 97 should include within its boundaries, in addition to the land as shown on the plat, the triangular piece formed by extending the east line of Ontario street in a straight line to intersect the north line of Huron street. The testimony of the plaintiffs below tended to show that after the purchase from Perry of the portion of the lot lying southwest of the line described in his deed, as indicated on Exhibit B, the premises had been for many years occupied by Ontario street, except a small portion thereof, which the plaintiffs claimed the city had never accepted or had long since abandoned for street purposes, and which consequently, under the terms of the deed, had reverted to the plaintiffs, who were the heirs of Perry. This corner of the lot, claimed by the plaintiffs, is described as being "a piece of land triangular in shape, inclosed between the southwesterly line of Ontario street as now traveled, the northerly line of Huron street as originally laid out, and the easterly line of Ontario street as originally laid out, extended down 'Vinegar Hill,' so called; said piece of land running to a point at its northwesterly extremity." The court below submitted to the jury certain propositions of law, and the question of fact as to whether the plaintiffs were entitled to recover this triangular piece of land, and the jury returned a verdict, awarding so much of the premises as is included in this triangular piece to the plaintiffs, and judgment was rendered accordingly.

In order to recover in an ejectment suit, it has long been the settled law of the federal courts that plaintiff must show a good legal title in himself, and must recover, if at all, upon the strength of his own title, and not upon the weakness of that of his adversary. Watts v. Lindsey's Heirs, 7 Wheat. 158, 5 L. Ed. 423. In Sheirburn v. Cordova, 24 How. 425, 16 L. Ed. 741, it was held that, notwithstanding the statutes of a state making different requirements, ejectment or trespass to try title to real estate could be maintained in the United States courts only on a strict legal title. To the same effect are Fenn v. Holme, 21 How. 481, 16 L. Ed. 198; Foster v. Mora, 98 U. S. 425, 25 L. Ed. 191; Bagnell v. Broderick, 13 Pet. 436, 10 L. Ed. 235. The same general rules are recognized in Ohio. City of Cincinnati v. Hamilton Co. Com'rs, 7 Ohio, pt. 1, pp. 88, 89; Eggleston v. Bradford, 10 Ohio, 312.

The Ohio Civil Code (section 5781, Rev. St.) provides that, in an action for the recovery of real property, it shall be sufficient if the plaintiff state that he has a legal estate therein, and is entitled to possession thereof, etc. It was therefore essential that plaintiffs establish, before they were entitled to recover in this action, a legal title to the premises in controversy, or, at least, to so much thereof as they finally claimed when the case was submitted to the jury. In the view we take of the case, it is only necessary to determine whether the premises recovered are a part of lot 97. Looking at the plat, as shown in either Exhibit A or B, there is apparent an undertaking

to outline a system of streets leading from the public square, and lots laid out in connection with the square and streets, to the number of 220. Where Ontario street, at its southern extremity, joins Huron street, the former is shown to be widened so as to cut off a corner of lot 97. It is shown in the testimony that at or near the place of connection there was a steep bank or bluff. This would have been a sufficient reason for taking from lot 97 a portion of the land which it would otherwise have occupied in order to make a good connection between the streets. Whatever the reason, it is perfectly apparent, from an inspection of the plat, that the southwest corner was cut off in making the draft of lot 97 in connection with Huron and Ontario streets. An inspection of the plat would not leave any purchaser in doubt as to the outline of lot 97. If we are to pass upon the case by the plat alone, there is little room for controversy as to the correct conclusion. Expert testimony was introduced by plaintiffs at the trial, in which engineers undertook to give their views of the matter. It was claimed by the plaintiffs that the plat does not correctly show the outline of lot 97, because of the accompanying minutes recorded with the plat, in evidence in the case, in connection with Exhibit A, as heretofore shown. These minutes undertake to give the outlines of roads, lands, and squares for the city of Cleveland as surveyed for the Connecticut Land Company in 1796 by Augustus Porter, said minutes being retaken by Amos Spafford, surveyor, in 1801. They contain an outline of the boundary of the city, and, in describing the roads laid out, a list of the streets is given, among others Ontario street, which is described as "beginning at a post standing on the bank of the lake in the west line of said street, 24 chains east of the east line of Water street; then running S., 34 degrees E., 51 chains, to a post standing in the north line of Huron street; said street is 1 chain and 50 links wide." This description locates the west line of Ontario street south of its intersection with the north line of Huron street, and the street is said to be 1 chain and 50 links wide. Giving it this uniform width would, it is claimed, have the effect of including within the outline of lot 97 not only so much as is shown on the plat, but its area would include the additional triangular piece made by projecting the east line of Ontario street in a direct line until it intersects the north line of Huron street. This description of the street, it is urged, must prevail over the outline of the lot in the plat, and be considered as giving to lot 97 the dimensions claimed by defendants in error. We cannot agree to this contention. It was evidently the purpose in making the plat that a permanent record should be had of the lots, public grounds, and streets which should constitute the city. To such a plat a purchaser would have recourse to ascertain the location and boundary of any lot or lots which he might desire to purchase. All parts of the description, the plats, and the notes should be reconciled, if possible, so as to prevent contradiction, and to carry out the intention and purpose of the proprietors. Assuming the plat to correctly show lot 97 to have been irregular in shape, there is still left the full width of Ontario street as recorded in the minutes. It has the full width of 1 chain and 50 links throughout, widened, it is true, where it joins Huron street.

The full width of the street is given by this construction, and lot 97 is not enlarged or changed as designated upon the plat. To adopt the construction contended for, and extend the lines of lot 97 so as to limit the width of the street throughout to just 1 chain and 50 links, is to correct and alter the plat as made and recorded, and to change the outline of lot 97 as shown thereon. We think the description and the plat can be reconciled upon the theory that it was the intention to give Ontario street the width named, except where it joined to Huron street, where the purpose to widen it is distinctly shown. If there was any substantial contradiction between the minutes and the recorded plat, which we do not perceive, we think the lot, as shown upon the plat, would control in determining its true outline. There is nothing in the minutes which indicates a different outline of lot 97 than is shown on the plat. Of the lots it is said:

"The above-described city or plot is laid into 220 lots, of about two acres each, which contain what land is described by the outline, except about 50 acres lying in the bend of the Cuyahoga, which is bottom land and not lotted out. For the particular numbers and boundaries of each lot, reference is to be had to the field notes and maps in the register's office in the county of Trumbull or in the city of Cleveland."

The territory, including the city of Cleveland, was originally a part of Trumbull county. If there are field notes or maps of record there or elsewhere, they have not been produced, and were not in evidence in the court below, and hence can be of no assistance to us in deciding this case. Turning to the description written in the deed, we find that Mr. Perry, who is the common source of title, in describing the portion of lot 97 deeded to the city of Cleveland, states it to be "all that part of original lot 97 on the plat of the village of Cleveland (now the city of Cleveland) lying southwesterly of the line," etc. Here the lot is referred to in direct terms by its number on the plat. To that plat the parties must look for evidence of title. It was made and recorded for the purpose of giving the purchaser a permanent record of the lots which he might acquire. It has been the policy of Ohio legislation for many years to require the making and recording of plats for cities and villages in the state. This plat was of record in Cuyahoga county long before the deed from Mr. Perry to the city was made. By reference to Chase's Ohio Statutes, we find that an act was in force in Ohio for the recording of town plats, at least as early as 1805. A comprehensive scheme for that purpose is found in the act of March 3, 1831 (3 Chase, St. p. 1846). We refer to this as evidencing the settled practice in Ohio as to the recording of such plats, and as showing the purpose of the law of the state to furnish purchasers of town and city lots evidence of the location and outline of their property by recorded plats. We have therefore reached the conclusion that lot 97 must be held to include so much territory as was given to it in the recorded plat, and that it cannot be enlarged by reference to the description of the adjacent street given in the minutes. The view we take of this case is in harmony with analogous decisions where controversies have arisen as to what effect is to be given to plats made parts of the description of real-estate surveys. In McIver's Lessee v. Walker, first reported in 9 Cranch, 173, 3

L. Ed. 694, and again in 4 Wheat. 444, 4 L. Ed. 611, the description of the premises granted did not include a certain creek, and an annexed plat referred to showed this creek or water course, as laid out, running through the land, and the court held that the tract must be so surveyed as to include the water course, and to conform as nearly as may be to the annexed plat, although the lines run may not coincide with the description called for in the certificate or patent. When the case was before the court as reported in 9 Cranch, 173, 3 L. Ed. 694, there having been considerable controversy about the true meridian, the chief justice said that he did not think that question had anything to do with the case. "The court decided it upon the plat." Further, he said, in disposing of the question: "In this plat thus annexed to the patent, and thus referred to as describing the land granted, Crow creek is laid down as passing through the tract, and every one would be instructed by the plat that the lands lay on both sides of the creek." In the present case purchasers of lot 97 could have knowledge of the plat, and be instructed by an inspection thereof that it was irregular in shape. In Parker v. Kane, 22 How. 1, 16 L. Ed. 286, it is held that a deed which conveys an undivided one-fourth part of a tract of land, viz. lots 1 and 6, being that part of the N. E. ¼ lying east of the Milwaukee river, conveys only lots 1 and 6, and not that part of the N. E ¼ which is without lots 1 and 6. In Wolfe v. Scarborough, 2 Ohio St. 361, it was held, Judge Thurman giving the opinion, that a description which calls for courses or distances may be controlled by a plat which is made part of a contract or deed. In this case there was a discrepancy between the lots as shown by the plat which had been made for the purpose of subdividing a tract of land, and the calls for courses and distances in the description thereof; it being the purpose of the original proprietor to make a plat which showed his entire tract of land divided into 13 lots. Speaking on this subject, Judge Thurman says, on page 367:

"We think it manifest that Hogg intended that the 13 lots should embrace all his land. And this intention is quite sufficient to control the estimate of quantity, and the memorandum that the lots are 200 perches square. The object of construction is to ascertain the intent of the parties, and, when this intent is discovered, it governs, unless the language employed renders it impossible to give it effect. There is no such difficulty in this case. The authorities are clearly on the side of the defendants. They show that, in a case like this, the map or plat is more to be relied on than a call for distance and quantity. McIver's Lessee v. Walker, 9 Cranch, 173, 3 L. Ed. 694; Id., 4 Wheat. 444, 4 L. Ed. 611; Lunt v. Holland, 14 Mass. 149; Davis v. Rainsford, 17 Mass. 207; Magoun v. Lapham, 21 Pick. 135."

In the present case we are of opinion that the plat controls, and settles the rights of the parties. This view is not modified by the transcript of the deed from the land company to Lord, above referred to, and as shown on page 50 of the record, in which a description of certain territory, including lot 97, is given by metes and bounds. We think that description entirely reconcilable with the plat which shows the corner of lot 97 to be cut off for street or highway purposes. In reaching the conclusions herein stated, we have not considered the plats offered by the city, and excluded from testimony by the court below, and need not now determine whether sufficient testimony had

been introduced to lay the foundation for their introduction. The testimony introduced by the defendants in error clearly shows that their claim for title was based upon the theory that the description of Ontario street would control the boundaries of lot 97 as shown in the plat. Rejecting that theory, there was no testimony adduced by them establishing title to the part of lot 97 embraced in the recovery had in the court below. The case was one in which, the plaintiffs having failed to establish their title, the jury should have been directed to return a verdict for the city. The learned judge, assuming that testimony had been introduced tending to establish the title of plaintiffs, submitted the case to the jury with a series of propositions applicable to that view of the case. The court erred in thus charging the jury. Exceptions were duly taken to the charge in this respect. The propositions given assumed that the plaintiffs had introduced testimony tending to establish title to the triangular piece above described; whereas, they had failed to introduce any testimony which, properly considered, tended to show that they had title to the land in controversy. In this view of the case, the judgment must be reversed, and the cause remanded for a new trial.